**STANDARD OIL COMPANY, Appellant,**

v.

**Mrs. Josephine FOSTER, as Guardian ad Litem for Harry L. Cookson, Appellee.**

**No. 18096.**

United States Court of Appeals
Fifth Circuit.

July 18, 1960.

David W. Dyer, L. L. Robinson, Miami, Fla., Louis S. Bonsteel, Miami, Fla., Smathers Thompson & Dyer, Miami, Fla., of counsel, for appellant.

Sam Daniels, Walter H. Beckham, Jr., William S. Frates, Miami, Fla., Nichols, Gaither, Green, Frates & Beckham, Miami, Fla., for appellee.

Before RIVES, Chief Judge, and JONES and WISDOM, Circuit Judges.

RIVES, Chief Judge.

This appeal is from a judgment in the amount of $150,000 for personal injuries suffered by Harry L. Cookson.[1] On August 28, 1956, Cookson was an employee of the corporate lessee-operator[2] of a Standard Oil Company service station in Miami, Florida. He was underneath an automobile which had been hoisted on a grease rack. The grease rack safety flaps[3] failed, and the car rolled off the rack, crushing Cookson's head.

---

[1] Among other injuries the complaint counted on "severe comminuted fractures of the skull" and "extensive brain damage." There is no contention that the $150,000 verdict is excessive and, hence, the evidence relating to damages and injuries is not included in the record on appeal.

[2] Of which Otis Brown and Lewis Cadden were the sole stockholders.

[3] Safety flaps are designed to keep cars from rolling off the rack. When the rack is lowered to the ground, the safety flaps depress so that cars can be moved on or off the rack. As the rack

The evidence showed that the failure of the safety flaps to function properly was caused by improper maintenance of the moving parts of the grease rack; that is, by a failure to keep those parts clean and oiled. There is testimony that one of the flaps had been out of order [4] for more than a month before Cookson was injured.

The sole insistence on appeal is that the district court erred in refusing to direct a verdict, or, in the alternative, to enter judgment for the defendant, Standard Oil Company, notwithstanding the verdict. Determination of that insistence turns on the answer to one narrow question, viz.: Was there evidence from which the jury could reasonably find that Standard Oil owed the plaintiff a duty to maintain the grease rack, and specifically the parts thereof which failed, in reasonably safe condition?

Standard Oil Company had built the filling station and installed this grease rack in 1954. Under date of June 1 of that year it had entered into a "Lease Agreement" of the premises with Otis E. Brown [5] at a rental based upon the volume of petroleum products purchased from Standard. Paragraphs 9 and 10 of that agreement read as follows:

"9. The Lessor shall have free access to the premises herein leased for the purpose of examining or exhibiting same, or to make any necessary repairs or alterations on said premises which said Lessor may deem necessary or which Lessee may request, but no such entrance shall be made in any manner to unreasonably interfere with the use and operation of the premises by the Lessee.

"10. The Lessee hereby assumes complete custody and control of the premises described in this lease, the condition of which Lessee has examined and knows to be good and on which no representations as to the condition or repair thereof have been made by the Lessor. The Lessor shall not be liable for any damage caused by failure to keep said premises in repair, but it shall be the duty of the Lessee to protect from damage or loss any property that Lessee or any other person(s) may have upon the premises; and, further, the said Lessee agrees to indemnify and save harmless the Lessor, its agents or employees, against all claims, liabilities, losses and suits, from any source whatsoever, including any damage which may be sustained by the Lessee, caused by or in any manner resulting from the legal and/or illegal actions of the Lessee and/or his employees or agents; including also loss by leakage, fire or explosion of gasoline, kerosene and/or motor oils stored on the premises."

Standard did not claim, however, that this particular piece of equipment was covered by the "Lease Agreement." Its attorney stated to the Court: "The equipment was not leased, your Honor, it was loaned." And Standard introduced in evidence a separate "Equipment Loan Agreement" bearing the same date, June 1, 1954, signed by Brown, the lessee, but made "subject to the approval of an Officer, Division Manager or Assistant Division Manager of the First Party (Standard)" and never so approved. No objection was made when the district court instructed the jury that it "is not a legal contract since not signed by Standard and is merely a proposed contract by Brown." Whether proposal, contract, or simply some evidence of the practice, that "Equipment Loan Agreement" pro-

goes up in the air, a counterweight works to elevate the safety flaps. When they are fully elevated, the counterweight operates a linkage which locks the flaps in place. The locking linkage contains a pin and slot arrangement which will not lock properly if it gets 1/32 of an inch off center.

4. "The right hand flap wouldn't lock. All you had to do is to touch it like that (indicating) and it would fall down."

5. Who later associated Lewis H. Cadden and had the business incorporated.

vided that "the First Party (Standard) hereby lends without charge to Second Party (Brown) the following described and enumerated equipment to be used exclusively for the storage and delivery of petroleum products purchased by Second Party (Brown) from First Party (Standard): * * *." The long list of equipment which follows includes the grease rack in question, described as "1— G & B ML4 roll on hyd lift." The instrument further provided:

"After said equipment is installed, the Second Party:

"(a) is to have complete custody and control of same during the existence of this agreement;

"(b) is to make all necessary repairs to said equipment;

"(c) is to be responsible for any and all damages resulting from the operation of said equipment or its failure to operate."

It would thus appear that the present case actually involves a bailment rather than a lease of the grease rack, but that is of little or no moment, for the parties are in agreement that the pertinent legal principles are the same in either case. The relationship plus the written instruments which have been described very clearly do not, *by themselves,* impose upon Standard any duty to maintain the grease rack in reasonably safe condition.

█ █ The appellant invokes as controlling the well-established rule followed by this Court in Miller v. Sinclair Refining Company, 5 Cir., 1959, 268 F.2d 114, that a lessor is not liable for injuries to one on premises in possession of a lessee unless the condition causing injury is a violation of law, is a pre-existing defect in construction or is inherently dangerous, *or unless the lessor undertakes to keep the premises in repair.* (Emphasis ours.) The appellee does not challenge the validity of that rule, but rather relies

upon the last stated exception, which we have emphasized, and insists that the jury could properly find from the evidence that Standard Oil undertook to maintain the grease rack in a reasonably safe condition. Such an undertaking imposes a duty alike upon the landlord,[6] or upon the mutual benefit bailor of property.[7]

█ The parties are thus in agreement as to the relevant substantive principles of law. And the question for decision is further narrowed to whether there was substantial evidence to support the jury's determination that Standard Oil undertook to maintain the grease rack in reasonably safe condition.

The testimony on that issue may be briefly summarized. The plaintiff drew from Standard's Miami manager that Standard had a maintenance department which serviced all of its filling stations alike, whether company operated or lessee operated. Standard's maintenance employees are furnished printed sheets to indicate the work done, one of the topics on which reads, "Repaired grease rack." At one point Standard's manager admitted, "Well, it is our practice to inspect these lifts every so often." He further testified as to "the maintenance on the lift": "We do what is necessary from a safety angle, to the best of our ability." Standard's manager visited the stations periodically, sometimes as seldom as every ninety days and sometimes as often as twice a week. Immediately after Cookson's injury, Standard's manager and four other Standard employees visited this particular station "to see what had happened."

On cross-examination of Lewis Cadden, part owner and manager of the filling station, he testified:

"Q. Mr. Cadden, talking about the Standard Oil Company, you said they didn't have much to do other

6. Miller v. Sinclair Refining Company, 5 Cir., 1959, 268 F.2d 114; Simms v. Kennedy, 74 Fla. 411, 76 So. 739, L.R.A. 1918C, 297; Propper v. Kesner, Fla. 1958, 104 So.2d 1.

7. 6 Am.Jur., Bailments, § 197, at p. 312; Atmore Truckers Ass'n v. Westchester Fire Ins. Co., 5 Cir., 1955, 218 F.2d 461.

than Mr. Browne came by, in the operation of the station. It was only in the maintenance where the Standard Oil took over, wasn't it? A. That's correct, sir. There was a certain amount of it that went with the station.

"Q. And that was the lift, it was one of those? A. Yes, sir."

On the part of the defendant, Standard Oil, there was no claim that it had abided by the strict terms of the "Equipment Loan Agreement" to leave with its bailee "complete custody and control" of the grease rack, including the duty "to make all necessary repairs." Its Miami manager testified: "* * * If the packing in that lift were to wear out we wouldn't permit, if we knew it, a dealer to re-pack that lift, because it requires proper packing, and so forth and so on. * * * And if it needed oil, he would call me to put oil in it." He undertook to qualify or explain his answer that "it is our practice to inspect these lifts every so often" by further testifying that such inspections would be made only "when a mechanic goes to a service station to work on the air compressor or pump or what-have-you, hydraulic lift, he is supposed to check and see if everything is working all right." In that connection, Lewis Cadden testified:

"Q. Mr. Cadden, for a period of six months prior to this accident had any representative of the Standard Oil Company been out to that service station to do any repairs of any kind? A. No, sir."

Thus, it is Standard's position that it was responsible only for major servicing and repairs to the grease rack on a "call" basis; that on such occasions the mechanic dispatched would inspect the equipment and, "if he sees something that is improper, not working properly, he is supposed to correct it before he leaves the station." Standard argues in brief: "There was nothing regular or periodic about this work, and it had nothing whatever to do with the cleaning and oiling of the stop-locks or flaps at the ends of the run-ways of the lift."

Concededly, however, on motion of the defendant for a directed verdict or for judgment n. o. v., the evidence must be considered in the light most favorable to the plaintiff. On this issue, the only available evidence was that of witnesses adverse to the plaintiff. The testimony of those witnesses could be accepted in whole or in part by the jury or disbelieved in whole or in part. The inferences and deductions reasonably to be drawn from the close relationship between Standard and its lessee-operator, and the maintenance of the grease rack as disclosed by the evidence, were matters for the jury's determination. With due regard for the sanctity of the verdict of the jury, we cannot hold that it was not supported by substantial evidence. The judgment is therefore

Affirmed.